[No. 34489-7-I.    Division One.    January 29, 1996.]

THE STATE OF WASHINGTON, *Respondent*, v. ROGER FLOYD ANDERSON, *Appellant*.

*Douglas R. Shepherd* and *Shepherd, Abbott & Woodall,* for appellant.

*David S. McEachran, Prosecuting Attorney,* and *Laura D. Hayes, Deputy,* for respondent.

GROSSE, J. — Roger F. Anderson was the driver of an automobile involved in a fatal traffic accident. Although he was not given the special evidence warning of the implied consent statute, RCW 46.20.308(2),[1] the trial court nevertheless admitted the results of blood and urine testing done following the accident.[2] We must reject the State's request to affirm the trial court's creation of a

---

[1]This section provides that in instances where the person is believed to have been driving under the influence of intoxicating liquor and is being treated at a treatment facility in which there is no breath testing equipment, a blood test shall be administered. In addition, the officer shall inform the person of his or her right to refuse the blood test, and of his or her right to have additional tests administered by any qualified person of his or her choosing as provided in RCW 46.61.506. The right to refuse the test is limited in certain instances by RCW 46.20.308(3), such that a blood test may be administered to a person arrested for vehicular homicide without his or her consent. However, he or she is entitled to be informed of the right to additional, independent testing of his or her blood.

[2]This appeal is taken prior to any trial on the charge of vehicular homicide.

substantial compliance exception to the rule. The evidentiary ruling is reversed and the case is remanded to the court below.

## FACTS

Roger Anderson lost control of the car he was driving. The evidence indicated the car went off the right edge of the roadway catching a wheel in the shoulder of the road. Anderson accelerated to get the car back on the road surface but in reentering the road lost control and crossed the center line. His car was struck broadside by a jeep pickup which was traveling at an excessive rate of speed. All of the passengers in Anderson's car were killed. Investigating officers at the scene suspected that both drivers and all passengers were intoxicated. Officers on the scene determined there was probable cause to arrest both drivers for vehicular homicide. Due to his injuries, Anderson was transported to a nearby hospital. Trooper Huffman was dispatched to the hospital to place Anderson under arrest for vehicular homicide and to procure blood samples for evidentiary purposes.

When the trooper arrived at the hospital, Anderson was being treated for his injuries. Medical personnel asked the trooper to wait until tests and treatment were completed before contacting Anderson or telling him of the fate of his passengers. The officer was concerned this might take a considerable amount of time, so he explained the situation to a hospital nurse and requested that she draw blood from Anderson. Three vials of blood were taken from Anderson by qualified personnel. The nurse sealed the vials. Trooper Huffman marked them and put them in his shirt pocket. The trooper intended that one of the vials was to be provided to Anderson for independent testing. A short time later the trooper was allowed to see and talk to Anderson.

The trooper informed Anderson about his passengers and informed him that blood had been drawn from him,

and that the trooper secured a separate vial of blood for Anderson's use. The trooper did not tell Anderson he had the right to additional testing of that blood by an independent laboratory of his choice.[3]

Later, Trooper Huffman requested that Anderson provide a urine sample to test for drugs. Anderson agreed. The drug screen of the urine came back negative for any drugs. Although not set out for the court, it is presumed that the test showed the presence of alcohol in Anderson's system.

Approximately an hour and a half later, the trooper spoke with Anderson's father at the hospital. The trooper testified that he gave the vial of blood to Anderson's father, as he told him Anderson had been arrested for vehicular homicide. He said he also told the father that he could take the vial to Gibb's Lab to have an analysis done. The trooper's report also stated that he advised Anderson's father as to what he knew and gave him the vial containing Roger's blood. He said he gave the father the name of a specific lab. The trooper said he wanted Anderson's father to maintain the blood for his son because he did not think Anderson was fully comprehending everything that was happening. But the trooper also testified that he believed Anderson comprehended the rights given him, that he did not demonstrate any confusion about the questions he was asked, and that the questions were answered appropriately. The trooper indicated only a slight problem in understanding Anderson's answers, because Anderson was wearing an oxygen mask. Trooper Huffman left the hospital and placed the blood and urine samples into evidence at the State Patrol office.

---

[3]In addition, the trooper read Anderson his *Miranda* rights (*Miranda v. Arizona*, 384 U.S. 436, 86 S. Ct. 1602, 16 L. Ed. 2d 694, 10 A.L.R.3d 974 (1966)) and formally arrested him for vehicular homicide. Anderson said he understood these rights; however, the trooper never specifically asked Anderson if he would waive his constitutional rights or if he was willing to answer questions prior to the trooper's questioning him. Anderson's understanding was that he had to answer the trooper's questions. The trial court found that the statements made by Anderson at the hospital were not the product of a knowing, intelligent waiver and suppressed any statements made. This ruling has not been appealed.

The State filed an information charging Anderson with three counts of vehicular homicide. CrR 3.5 and CrR 3.6 hearings were held. The trial court concluded that Anderson's statements were not made following a knowing and intelligent waiver of his rights and suppressed the "confession." The court did find both the blood and urine tests admissible.

## DISCUSSION

Anderson contends the trial court erred in denying the motion to suppress the results of the blood sample where the arresting officer failed to advise him that he had the right to additional and independent testing of his blood at the time it was drawn. We must agree. Supreme Court precedent requires that a person who submits to a blood test at the direction of the State be informed of his/her statutory right to an additional test by a qualified person of his or her own choosing.[4]

■ Under *Turpin*, the appropriate remedy is exclusion.

> The State cannot be allowed to use evidence which the defendant is unable to rebut because she was not apprised of her right to independent testing. Evidence obtained unlawfully is excluded, *State v. Miles*, 29 Wn.2d 921, 190 P.2d 740 (1948), and the taking of Ms. Turpin's blood without informing her of her right to seek alternative testing violated RCW 46.20.308(1). Exclusion is the appropriate remedy for violation of defendant's statutory rights.

*State v. Turpin*, 94 Wn.2d 820, 826-27, 620 P.2d 990 (1980). Anderson should have been apprised of the right to independent testing, regardless of the fact that he lost the

---

[4]*See* RCW 46.61.506(5); *State v. Turpin*, 94 Wn.2d 820, 824-25, 620 P.2d 990 (1980); *State v. Dunivin*, 65 Wn. App. 501, 503, 828 P.2d 1150, *review denied*, 120 Wn.2d 1002 (1992).

right to revoke his consent to testing by the State when he was arrested for vehicular homicide.[5]

The trial court concluded the blood test was admissible because the trooper "substantially met" the legislative intent underlying the special evidence warning by arranging to take a blood sample for Anderson and giving it to his father an hour and a half later. The court found that the officer gave an appropriate explanation to a "close available family member." The State requests this court to forge a "substantial compliance rule" for the special evidence warning. We must decline to do so.

First, *Turpin* clearly controls the result in this case, and this court is without authority to modify that decision despite what we may think to be the better policy. *State v. Gore*, 101 Wn.2d 481, 681 P.2d 227 (1984).

In addition, while we sympathize with the trial court's desire to avoid the seemingly harsh result of applying *Turpin*, we do not believe that this record will support a conclusion of substantial compliance. Anderson was not comatose or unable to understand, yet *he* was not given the required warning. The trooper's own testimony was conflicting. On one hand, he said he did not think Anderson comprehended everything that was transpiring; but on the other hand, he did not refrain from questioning Anderson because, as he testified, he believed Anderson understood the *Miranda* rights, understood the waiver, understood the questions, and answered them appropriately. Thus, his failure to give Anderson the warning is not sufficiently explained.

The State argues that substantial compliance was achieved when the trooper told Anderson's father that he could take the vial of blood to "Gibb's Lab" and have an analysis performed. While the trial court took "judicial notice" of the fact that "Gibb's Lab" was an independent

---

[5]*Turpin*, 94 Wn.2d at 826 (citing with approval *State v. Carranza*, 24 Wn. App. 311, 320-21, 600 P.2d 701 (1979) (McInturff, J., dissenting), *review denied*, 93 Wn.2d 1006 (1980)).

laboratory, no proof of the existence of "Gibb's Lab" was ever offered. This was not a proper subject for judicial notice under ER 201(b):

> A judicially noticed fact must be one not subject to reasonable dispute in that it is either (1) generally known within the territorial jurisdiction of the trial court or (2) capable of accurate and ready determination by resort to sources whose accuracy cannot reasonably be questioned.

As pointed out in Anderson's reply brief, there is no listing for "Gibb's Lab" in any of the area's phone books. Nor does the record disclose that Anderson's father knew what the trooper meant when he specified "Gibb's Lab." *Turpin* requires the defendant be advised of the right to additional testing by "a qualified person of [his] own choosing," not that the defendant's father be advised to take the sample to a named lab without further explanation. The trial court erred in forging a substantial compliance test on these facts. As a consequence of the trooper's failure to give the proper special evidence warning, the results of the blood test must be suppressed.

Next, Anderson contends the trial court erred in concluding that alcohol is a drug, such that the officer's request for a voluntary urine sample for purposes of drug testing included testing for the presence of alcohol. Not only did the trial court find that alcohol was a drug, it concluded that the trooper's request for a urine sample, to be tested for "drugs," was sufficiently broad to logically include alcohol as a drug. The court also concluded that analysis of the urine for its alcohol content was within the scope of the request made by Trooper Huffman, agreed to by Anderson.

■ Whether alcohol is a drug, and whether the request was sufficiently broad to include testing for alcohol in the urinalysis, is of no moment. WAC 448-14-010 specifically states, "Analysis of urine for estimation of blood alcohol concentrations is *not* approved by the state toxicologist in the state of Washington." (Emphasis added.) Under RCW

46.61.506(3), the admissibility of information or test results must be as a result of a test approved by the state toxicologist. *See Mairs v. Department of Licensing*, 70 Wn. App. 541, 548, 854 P.2d 665 (1993); *State v. Clark*, 62 Wn. App. 263, 267, 814 P.2d 222 (1991); *see also State v. Schulze*, 116 Wn.2d 154, 167, 804 P.2d 566 (1991) (WAC is sufficient to meet requirement of statute, and it is not court's function to substitute judgment for that of toxicologist). This avoids presumably unreliable tests being used against a defendant. Thus, the results of the urinalysis are not admissible for purposes of estimations of blood alcohol content, and the trial court's decision was in error if this test were to be allowed for that purpose.

The trial court is reversed and the matter remanded for further proceedings.

KENNEDY, A.C.J., and SCHOLFIELD, J. Pro Tem., concur.